Ronald P. BERLIN, David L. Florence, Craig Hall, Rex A. Sebastian, Theodore H. Strauss and May Petroleum, Inc., a corporation of the State of Delaware, Defendants Below, Appellants,

v.

EMERALD PARTNERS, a New Jersey limited partnership, Plaintiff Below, Appellee.

Supreme Court of Delaware.

Submitted: Aug. 15, 1988.
Oral Decision: Aug. 15, 1988.
Written Opinion: Jan. 12, 1989.

**484**

William Prickett, Wayne N. Elliott, John H. Small, Vernon R. Proctor of Prickett,

Jones, Elliott, Kristol & Schnee, Michael D. Goldman, Donald J. Wolfe, Jr., William J. Marsden, Jr. of Potter, Anderson & Corroon, Wilmington, A.B. Conant, Jr. (argued), Ivan Irwin, Jr. of Shank, Irwin, Conant, Lipshy & Casterline, Louis Bickel, Margaret L. Vandervalk, of Akin, Gump, Strauss, Hauer & Feld, Dallas, Tex., and Daniel F. Berry of Simpson & Moran, Birmingham, Mich., on behalf of appellants.

R. Franklin Balotti (argued), and Gregory V. Varallo of Richards, Layton & Finger, Wilmington, Robert J. Schechter of Koether, Harris & Hoffman, New York City, on behalf of appellee.

Before CHRISTIE, C.J., HORSEY, MOORE, HOLLAND, JJ., and BIFFERATO, Judge (sitting by designation pursuant to Del. Const. art. IV., § 12) (constituting the Court *en banc*).

HOLLAND, Justice, for the majority.

Emerald Partners ("Emerald"), a New Jersey limited partnership, brought this action in the Court of Chancery on March 1, 1988. The defendants are May Petroleum, Inc. ("May"), a Delaware corporation; its three outside directors, David L. Florence, Rex A. Sebastion, and Theodore H. Strauss; and its two inside directors, Craig Hall and Ronald P. Berlin (collectively, "the May Board"). Emerald originally brought this suit individually, and subsequently amended its complaint to allege class and derivative claims.

Emerald sought to enjoin the consummation of a merger between May and thirteen corporations owned by Craig Hall ("Hall"), the Chairman and Chief Executive Officer of May. Following extensive discovery, a preliminary injunction hearing was held on March 16, 1988. The Court of Chancery entered an order on March 18, 1988, preliminarily enjoining consummation of the May merger with the Hall corporations on the grounds that:

(a) Under a provision of the May certificate of incorporation, a supermajority

vote of the May stockholders on the merger was required; and

(b) At the special meeting of the May stockholders, either no quorum was present or the merger did not receive the requisite supermajority vote.

This case was accepted, on an expedited basis, as an interlocutory appeal under Supreme Court Rule 42. Following oral arguments and deliberations on August 15, 1988, this Court announced its decision.[1] A majority of this Court held that the provision of the May certificate of incorporation requiring a supermajority vote was not applicable, under the facts of this case, to the merger proposal presented to the May stockholders. However, the Court was in unanimous agreement that if the supermajority provision in the May certificate of incorporation was applicable to the merger proposal, the requisite supermajority vote had been achieved. Therefore, the judgment of the Court of Chancery preliminarily enjoining the merger was reversed, the injunction was vacated, and a mandate remanding the case was issued forthwith. This opinion sets forth the reasons for the decision that was announced on August 15, 1988. Supr.Ct.R. 19.

*Facts*

The parties to the challenged merger are May and thirteen Sub-chapter S corporations owned by Hall ("the Hall corporations"). The Hall corporations are primarily engaged in the real estate service business. May is a Delaware corporation headquartered in Dallas, Texas. May had been engaged in the business of oil and gas exploration until July 30, 1987, when May sold substantially all of its income producing properties. Since that time, May has ceased to be an operating company. Its assets consist primarily of cash, marketable securities, a limited partnership interest, and net operating loss and capital loss carry forwards (collectively "NOL's"). Although May had not been financially suc-

cessful in recent years, reporting losses of approximately $80 million from 1983 to 1986, May remained an attractive takeover target due to the liquidity of its assets and a net operating loss carryover of approximately $54 million.

During the years 1983 through 1986, while May was losing approximately $80 million, audited financial statements show that the Hall corporations made approximately $67 million. In October of 1987, Hall controlled at least 52% of May's outstanding common stock. On October 24, 1987, at a special meeting of May's directors, Hall requested that the outside directors of May's Board agree to examine the possibility of a merger with the Hall corporations.

On November 7, 1987, May's Board decided to consider a merger proposal. The outside directors retained the investment banking firm of Bear Stearns & Co., Inc., to assess the terms of any merger and ultimately to issue a fairness opinion. The law firm of Shank, Irwin, Conant, Lipshy & Casterline[2] was retained by the outside directors to advise and negotiate a fair arrangement for the minority stockholders. Arthur Anderson & Company was hired to verify the financial statements of May and the Hall corporations.

On November 24, 1987, the May Board met and was presented with the preliminary valuations of May and the Hall corporations. Following this presentation, Hall agreed to accept 27 million shares of May stock in exchange for his shares in the Hall corporations. May and the Hall corporations entered into a proposed merger agreement on November 30, 1987. The execution of the merger agreement was made public through a press release that was disseminated by the May Board.

Emerald is a minority stockholder of May. Emerald was formed and is controlled by Paul Koether ("Koether") and his wife, Natalie Koether, Esquire. On December 10, 1987, Hall met with Koether

---

1. Oral argument was originally heard before a panel of this Court on May 13, 1988. This Court *sua sponte* ordered rehearing *en banc.* Supr.Ct. R. 4(d).

2. This is a Dallas law firm, experienced in corporate matters, which had never represented either Hall or May.

in Dallas, Texas, at Koether's request. Koether told Hall that he represented interests which owned 450,000 shares of May's stock.[3] Koether explained to Hall that he and his wife made money by selling their stock positions back to the issuing companies at a significant profit. Koether proposed that he and Hall become partners in these types of "greenmail" transactions.[4]

Koether's efforts to persuade Hall to join forces with him for the purpose of investing in several stocks were unsuccessful. However, Hall inquired of Koether about buying out Emerald's stock holdings in May. At the time of Hall's request, May had a nominal market value of approximately $1.00 per share. Koether stated that Emerald would sell its May stock at a price of $1.80 per share before January 1, 1988, and at $2.24 per share thereafter. This offer was rejected by Hall. Koether replied that if Hall did not purchase Emerald's stock holdings in May, he would purchase additional stock in May. Koether suggested that the provisions of Article Fourteenth of the May certificate of incorporation made it possible for him to block, or make it difficult for Hall to complete, the proposed merger.

Article Fourteenth of the May certificate of incorporation requires that for May to be a party to certain business combinations, the proposed combination must receive a supermajority vote. In particular, such a vote is required where the proposed merger is between May and an acquiring entity owning in excess of 30% of May stock. Since Hall owned or controlled approximately 52% of the May stock, the provisions of Article Fourteenth were applicable to the proposed merger with the Hall corporations. Therefore, if Koether followed through with his intention to acquire more of May's stock through Emerald, he arguably would be able to block the pro-

posed merger by virtue of Emerald's minority holdings of May's stock.

Hall was concerned that Emerald would continue to acquire May stock and that the supermajority vote required by Article Fourteenth could not be obtained. In fact, Hall perceived, and the Court of Chancery characterized, Emerald's statements to Hall as a "threat." Accordingly, Hall decided to "drop down", or reduce, the amount of May stock which he controlled. His initial inclination was to donate a substantial portion of his May stock to charity. However, he and the other May directors were advised that such a charitable contribution would result in the loss to May of a very valuable asset, i.e., the NOL's.

Thereafter, Hall and the May Board were advised that Hall could transfer a significant portion of his May stock to an irrevocable trust for his children, with independent trustees, and a smaller percentage of the stock to charity, without the loss of May's NOL's. This suggestion appealed to Hall. A portion of May stock would be removed from Hall's control for purposes of Article Fourteenth and the transfer would further his charitable and estate planning objectives.

On January 28, 1988, the May Board met and set March 8, 1988, as the date for a special meeting of the stockholders to vote upon the merger proposal with the Hall corporations. The record date was set as February 2, 1988. On February 1, 1988, effective January 29, 1988, Hall transferred 3,981,771 shares of May stock (constituting 27% of May's outstanding common stock) to an independent irrevocable trust, set up for the benefit of his four daughters ("Hall 1988 Children's Trust"). The two co-trustees were vested with independent power to vote or dispose of the shares owned by the trust. The net effect of this transfer was to reduce Hall's personal own-

---

**3.** The actual number of May's shares controlled by the Koethers is not clear from the record. On the date of the hearing, Emerald owned 330,000 shares of May stock or approximately 2.2% of May.

**4.** The term "greenmail" has been defined as "the accumulation of a significant amount of stock by a shareholder, or group of shareholders act-

ing in concert, for the purpose of intimidating a board of directors into causing the corporation to repurchase such shares at a substantial premium over their realistic market price." *Good v. Texaco, Inc.,* Del. Ch., C.A. No. 7501, Brown, C., slip op. at 21 (Feb. 19, 1985) [1985 WL 11536].

ership of May stock from 52% to 25%, at a time prior to the record date, and prior to the stockholder vote on the merger.

On February 13, 1988, the May Board reaffirmed the merger agreement which was eventually presented to and voted upon by the May stockholders.[5] The May stockholders were advised in a proxy statement of the reduction in Hall's percentage of stock ownership as a result of the transaction with the trust. On February 16, 1988, May released a Proxy Statement to its stockholders seeking approval of the merger agreement ("Proposal One") and approval of an amendment to Article Fourteenth of the May certificate of incorporation ("Proposal Two"). The proxy statement addressed the issue of the need for approval of the merger by a majority vote rather than a supermajority vote after the drop down in Hall's percentage of ownership.[6]

Pursuant to the May bylaws and the proxy statement, the stockholders of May held a special meeting in March for the purpose of voting on the two proposals. Of the 14,655,660 shares entitled to vote as of the record date, 11,834,661 shares were represented in person or by proxy. Approximately 10,513,703 shares were voted as to Proposal One, with 9,934,172 votes in favor. With respect to Proposal Two, of the 11,834,661 shares represented, 11,151,- 902 voted in favor.

### Applicability of Supermajority Vote Provision

■ The Court of Chancery granted Emerald a preliminary injunction enjoining the consummation of the merger because the stockholder approval of the merger failed to meet the supermajority voting requirements of Article Fourteenth of May's cer-

tificate of incorporation. The first issue to be decided on appeal is whether this supermajority vote requirement is applicable to the merger proposal. In pertinent part, the supermajority vote provision states:

No Business Combination shall be effected unless it is approved at a meeting of the Corporation's stockholders called for that purpose. The presence in person or by proxy of the holders of not less than 80% of the voting securities of the Corporation shall be required to constitute a quorum at any such meeting. The affirmative vote of 66-⅔% of the voting power present, in person or by proxy, at such meeting, excluding all voting securities owned beneficially, by the Acquiring Entity, shall be required for approval of any such Business Combination.

May's certificate of incorporation defines a Business Combination as "any merger or consolidation of the Corporation [May] with or into any other corporation, person or other entity which is the beneficial owner, directly or indirectly, of 30% or more of the outstanding voting securities of the Corporation." May's certificate of incorporation also provides that the supermajority vote of minority stockholders is required unless the May Board authorized the Business Combination:

prior to the time that any such corporation, person or other entity became the beneficial owner, directly or indirectly, of 30% or more of the outstanding voting securities of the Corporation. A corporation, person or other entity which is the beneficial owner, directly or indirectly, of 30% or more of the Corporation's outstanding voting securities (taken together as a single class) is herein referred to as the "Acquiring Entity".

5. At oral argument before this Court, the appellants' attorney agreed that there was no material change in the merger agreement between the date of its approval by the May Board, November 30, 1987, and the date the Board reaffirmed it, February 13, 1988. The only change was the reduction in ownership of May stock by Hall. *See,* May Petroleum, Inc., Proxy Statement/Prospectus at 64 (February 16, 1988) (disclosing transfer of ownership of part of Hall's stock). For the purpose of this opinion, we have as-

sumed that the May Board "approved" the merger on November 30, 1987.

6. The proxy statement disclosed that Hall's attorneys had provided a written legal opinion that the supermajority requirements of Article Fourteenth were no longer applicable to the merger proposal. The proxy statement also disclosed that the May Board had been independently advised that it could rely upon the legal opinion rendered to Hall.

The Court of Chancery interpreted Article Fourteenth of May's certificate of incorporation as requiring a supermajority vote to approve a merger with any entity that held 30% or more of May's outstanding common stock at the time the May Board voted to recommend the merger. This interpretation makes the percentage of stock ownership on the date of the *directors'* vote determinative of the applicability of Article Fourteenth. The Court of Chancery concluded that since the May Board authorized the merger on November 30, 1987, "long after Mr. Hall, the Acquiring Entity, obtained 30% of May's stock and while he still controlled it," the supermajority vote requirements were applicable to the merger. Emerald urges this Court to affirm that conclusion.

The appellants contend that the critical time for determining the applicability of Article Fourteenth is the date of the *stockholder* vote. The appellants argue that the supermajority vote provision applies only to a merger with an Acquiring Entity (30% stockholder). Since Hall only owned 25% of May's common stock at the time the merger was ratified by the stockholders, the appellants contend that there was no Acquiring Entity being merged into May. Accordingly, the appellants argue that the supermajority vote provision in Article Fourteenth did not apply to the proposed merger.

█ In examining the provisions of a certificate of incorporation, courts apply the rules of contract interpretation. *Hibbert v. Hollywood Park, Inc.,* Del.Supr., 457 A.2d 339 (1983). "We only construe the [provision] ... as it is written, and we give language which is clear, simple, and unambiguous the force and effect required." *Id.* at 343. Put another way, the best evidence of the intention of the parties is often found in the express language of a written contract. 4 S. Williston, *A Treatise on the Law of Contracts* § 610 (3d edition 1961 & Supp.1988). Nevertheless, the contract rights of the stockholders of the cor-

poration are also subject to the provisions of the Delaware General Corporation Law. *Loew's Theatres, Inc. v. Commercial Credit Company,* Del. Ch., 243 A.2d 78, 81 (1968).

█ The provision for a supermajority vote in May's certificate of incorporation is applicable only to a Business Combination. May's certificate of incorporation defines a Business Combination as any *merger* or consolidation between May and "any other ... entity which *is* the beneficial owner ... of 30% or more of the outstanding voting securities of [May]." (emphasis added). The Delaware General Corporation Law provides that, notwithstanding certain filing requirements, *see e.g.,* 8 *Del.C.* § 103 (1983 & Supp.1988), a merger is not complete until the stockholders of the corporations have voted to approve it. *See,* 8 *Del.C.* § 251(c) (Supp.1988). In this case, we find no inconsistency between May's certificate of incorporation and the applicable provisions of the Delaware General Corporation Law.

The Court of Chancery correctly recognized that the proposed merger could not be effective until the stockholders voted. However, the Court of Chancery concluded that, by its terms, Article Fourteenth applied at the time the May stockholders voted upon this merger, because Hall owned more than 30% (52%) of May's stock at the time the directors voted to recommend it. We do not find that there is anything in the language of Article Fourteenth which requires its application to *any* merger with an entity, which is *not then* the owner of 30% or more of the company, if that entity *had ever* previously owned 30% or more of May's stock. If Article Fourteenth was intended to apply to such situations, it could have expressly so provided.[7]

Supermajority provisions take various forms and are generally intended to offer protection to minority stockholders from a majority stockholder who would, but for the supermajority provision, be able to

---

7. *See, e.g.,* 3, R.F. Balotti & J. Finkelstein, *The Delaware Law of Corporations and Business Organizations,* Form 1.15 at 23 ("at any time within two years prior thereto was the beneficial owner, directly or indirectly, of not less than 10% of the then outstanding Voting Shares.")

force a merger onto the corporation.[8] This is so because in the absence of the supermajority provision, a mere simple majority of the outstanding stock of the corporation entitled to vote on the merger is needed to approve a merger. 8 *Del.C.* § 251(c) (Supp. 1988). The provisions of the May certificate of incorporation are specifically designed to protect minority stockholders only from a major stockholder who has the ability to dominate a merger proposal at *both* stages of the process, i.e., when the board votes *and* when the stockholder votes.

The May certificate of incorporation does not require a supermajority vote, even with an Acquiring Entity, if the May Board authorized the merger proposal *prior* to the time when 30% of the May stock was acquired. The protection of a supermajority vote was apparently deemed unnecessary and was not made applicable to a merger proposed by a board that was not capable of being "influenced" by a major stockholder (holder of a 30% or more interest). Conversely, even if a major stockholder was capable of "influencing" the board in proposing a merger, the requirement of a supermajority vote is not provided for in the May certificate of incorporation to protect the minority stockholders from continued "influence" at the time of the stockholder's vote, *if* there has been a reduction in stock ownership below the 30% level. Apparently, it was thought that whatever influence might have been exerted upon the board to suggest the merger proposal could no longer be brought to bear at the stockholder's meeting, after the reduction in stock ownership below 30%.

The terms of the supermajority provision are unambiguous. We find that the relevant time to assess whether the supermajority vote provision in May's certificate of incorporation is triggered is when the merger proposal is presented to the stockholders for a vote. On the date of the stockholder vote,[9] if the proposal is for a merger with an Acquiring Entity, the provisions of the May certificate of incorporation direct one to look back to the date of the directors' resolution to determine the percentage of votes which are needed to pass the proposal. If the Acquiring Entity also owned a 30% interest on the date of the directors' resolution, a supermajority vote is needed. If the Acquiring Entity held less than a 30% interest prior to the directors resolution, only a majority vote by the stockholders is necessary. If no one holds a 30% interest on the date of the stockholders' vote, there can be no merger with an "Acquiring Entity" and Article Fourteenth has no applicability at all.

■ The operation of the provisions and the protections afforded by the supermajority provisions in the May certificate of incorporation are manifested by the facts of this case. When Hall determined that he might be unable to gather the requisite supermajority vote, he decided to reduce his ownership of May stock below 30% to avoid the applicability of Article Fourteenth. However, in so doing, Hall ceased to be a majority stockholder, and thus, was incapable of forcing ratification of the proposed merger by the stockholders.

*Reduction in Hall's Stock Holdings*

■ Emerald argues that even under this Court's construction of Article Four-

---

8. The approval of a merger, under the Delaware General Corporation Law, requires the affirmative vote of a majority of the outstanding common stock of the corporations unless the certificate of incorporation provides for a higher percentage. Supermajority vote provisions were originally formulated as antitakeover devices. By requiring a greater percentage of stockholders to approve a proposed corporate action, stockholders are given more power to defeat actions adverse to their interests. *See* 8 *Del.C.* § 251(c) (Supp.1988). *See also,* Friedenberg, *Jaws III: The Impropriety of Shark–Repellent Amendments as a Takeover Defense,* 7 Del.J.

Corp. L. 32, 42–44 (1982); F.H. O'Neal & R. Thompson, *O'Neal's Oppression of Minority Shareholders* § 9.08 (2d ed. 1985).

9. The record date establishes those stockholders who are eligible to vote. 8 *Del.C.* § 213 (Supp. 1988). To the extent the phrase "date of the stockholder vote" is used in this opinion, it is inexorably tied to the record date. Since the record date precedes the meeting date, the requisite vote which is needed is always ascertainable in advance of the meeting.

teenth, Hall's transfer of stock to the Hall 1988 Children's Trust was an improper effort to deny the minority stockholders' rights. Hall argues that his actions were valid and designed to comply with the terms of the May certificate of incorporation. This Court will not tolerate "the wrongful subversion of corporate democracy." *Giuricich v. Emtrol Corp.*, Del. Supr., 449 A.2d 232, 239 (1982). *See also Young v. Valhi, Inc.*, Del. Ch., 382 A.2d 1372 (1978). Therefore, we now examine the transfer which resulted in the reduction of Hall's stock holdings.

At the time when the May Board first approved the merger, November 30, 1987, Hall did, in fact, own more than 30% of May's outstanding voting stock. Hall transferred 27% of the May stock, previously controlled by him, to the Hall 1988 Children's Trust. This trust is irrevocable[10] and vests absolute power to control the investment of its securities and any voting rights associated therewith, in co-trustees. The trustees are a Dallas rabbi and a Florida attorney selected by Hall.

Emerald challenges their "independence".[11] However, the co-trustees of the trust are imbued with fiduciary duties to act in favor of the *cestui que trusts*. The co-trustees would have the duty to vote in opposition to the merger, if in their view the merger were adverse to the interests of the *cestui que trusts*. There is no evidence in the record to suggest *any* agreement, or arrangement or understanding, between the co-trustees and Hall or the Hall corporations with respect to voting on the proposed merger, and there is no legal basis to assume that the co-trustees would act contrary to their fiduciary duties. *Cf. Kaufman v. Belmont*, Del. Ch., 479 A.2d 282, 287 (1984) (court will not assume that a director designated by dominant stockholder will fail to perform his fiduciary duties).

We find that Hall's conveyance to the Hall 1988 Children's Trust effectively divested him of any ownership and control of those shares and reduced his ownership and control to 25% of the May stock. *Cf. Sundlun v. Executive Jet Aviation, Inc.*, Del. Ch., 273 A.2d 282 (1970). At the time the stockholders voted on the proposed merger, March 11, 1988, Hall's interest in May remained unchanged at 25%. At the time the merger was put to the stockholders for a vote, Hall, who no longer owned a majority interest in May, was without the power or the ability to force the merger upon the stockholders. The stockholders had the ability, if they so desired, to prevent the consummation of the merger.

The record indicates that a majority of the outstanding stock of the corporation was voted in favor of the merger with the Hall corporations. Since the supermajority vote provision did not apply, all that was necessary to ratify the merger proposal was the affirmative vote of a simple majority of the stockholders. *See,* 8 *Del.C.* § 251(c) (Supp.1988). The decision of the Court of Chancery enjoining the merger,

---

**10.** Emerald's attorney reaffirmed this at oral argument:

> THE COURT: Well, do you concede that the transfer to the trust is irrevocable?
>
> THE ATTORNEY: Your Honor, I do not have an argument that I can present to the Court at this time that the trust shares can be returned to Mr. Hall.
>
> THE COURT: So you concede that point, that the trust shares are irrevocably transferred?
>
> THE ATTORNEY: I concede that on the present record there is nothing which would indicate they are not. I am not prepared to concede that point forever.
>
> THE COURT: But certainly as we stand here today you are conceding it for the purpose of this record, is that right?
>
> THE ATTORNEY: No question about it, yes, sir.

> THE COURT: It was a valid transfer.
>
> THE ATTORNEY: I concede that point.

**11.** The trust provides that all of the trust powers reside in the co-trustees. Among other things, the trust provides that "[n]o person, other than the [co-trustees], acting in [their] fiduciary capacity, shall have or exercise the power to vote or direct the voting of any stock or other securities of the trust, to control the investment of the trust either by directing investments of the trust or reinvestments, or to reacquire or exchange any property of the trust by submitting other property of an equivalent value." Trust Agreement Article X(A). The only right given the *cestui que trusts* (the beneficiaries of the trust—Hall's children) is the right to the specific distributions provided for under the trust.

due to an absence of an affirmative super-majority vote, is REVERSED.

## Quorum/Voting Power Distinguished

■ We have concluded that there was no merger with an Acquiring Entity and, therefore, that Article Fourteenth was completely inapplicable. However, we shall now assume, *arguendo*, that Proposal One involved a Business Combination with an Acquiring Entity, i.e., the Hall corporations, as affiliates of a 30% stockholder.

Pursuant to Article Fourteenth, there are two voting requirements that must be satisfied for a Business Combination with an Acquiring Entity, such as the merger, to gain approval. First, there must be the *"presence* in person or by proxy of the holders of not less than 80% of the voting securities of the Corporation" (*i.e.,* an 80% quorum) (emphasis added). Second, the Business Combination must be approved by the "affirmative vote of 66–½% of the *voting power present,* in person or by proxy, *at such meeting,* excluding all voting securities owned beneficially, directly or indirectly, by the Acquiring Entity" (emphasis added). Specifically, the supermajority language of Article Fourteenth establishing the quorum and voting requirements in such a situation provides:

> The presence in person or by proxy of the holders of not less than 80% of the voting securities of the Corporation shall be required to constitute a quorum at any such meeting. The affirmative vote of 66–⅔% of the voting power present, in person or by proxy, at such meeting, excluding all voting securities owned beneficially, directly or indirectly, by the Acquiring Entity [30% or more stockholder], shall be required for approval of any such Business Combination.

The February 16, 1988, Proxy Statement and Notice of the March 11, 1988, Special Meeting of Stockholders sought stockholder approval for two different proposals: (a) the approval and adoption of the merger agreement between May and the Hall cor-

porations ("Proposal One"), and (b) the amendment of May's certificate of incorporation to increase the authorized number of May common shares to 100 million ("Proposal Two").

The record indicates that 14,655,660 shares were entitled to vote at the special meeting of the stockholders, as of the record date. Of the 14,655,660 shares entitled to vote, 11,834,661 shares were represented at the meeting in person or by proxy, and were all counted as present for the purpose of establishing a *quorum* (80.8%). Hall controlled 3,675,359 of the shares represented at the meeting. Emerald did not attend the special meeting in person or by proxy.

■ The Certificate of Judges of Voting reflects that the *power to vote* on Proposal One was *withheld* on 1,329,958 shares. The inspectors of election at the stockholders meeting counted 10,513,703 (11,843,661 minus 1,329,958) shares as voting power on Proposal One, with 9,934,172 of these shares voted in favor of the proposed merger, 432,796 opposed, and 146,735 abstained.[12] On Proposal Two, all 11,834,661 shares represented voted, with 11,151,902 shares voted in the affirmative, 485,912 voted against, and 161,747 abstained. Although the report of the inspectors of election is ministerial, it is presumed to be correct. *Atterbury v. Consolidated Coppermines Corp.,* Del. Ch., 20 A.2d 743 (1941); *Cf. Williams v. Sterling Oil of Oklahoma, Inc.,* Del.Supr., 273 A.2d 264 (1971). However, when the question is whether there was a quorum at the meeting, a court may inquire into the actual facts. *Atterbury v. Consolidated Coppermines Corp.,* 20 A.2d at 748.

The appellants argue that the inspectors of election were correct in deciding that there was a quorum consisting of 11,843,-661 shares present in person or by proxy at the meeting. The appellants also argue that the inspectors of election were correct in deciding that only 10,513,703 shares represented had voting power with respect to

---

12. The Judges of Voting treated the 1,329,958 shares as to which voting power was withheld

on Proposal One as not voting.

Proposal One (the merger). Thus, the appellants argue that the voting judges properly used the larger number to determine whether or not the *quorum requirements* of Article Fourteenth had been met, and the smaller number to determine if the 66–⅔% *voting power requirement* of Article Fourteenth had been satisfied.

The Court of Chancery concluded that there was no basis for combining the stockholders entitled to vote on both proposals for the purpose of determining a quorum and then separating the two proposals for the purpose of determining the amount of "voting power present ... at such meeting." The Court of Chancery held that "[e]ither there were only 10,513,703 shares present, and therefore, no 80% quorum, or there were 11,843,661 shares present and therefore, no 66–⅔% supermajority vote. In either case, the vote is invalid and the proposed merger may not be approved." *Emerald Partners v. Berlin*, Del. Ch., C.A. No. 9700, Hartnett, V.C., slip op. at 19 (March 18, 1988) [1988 WL 25269]. We disagree.

The supermajority provision of Article Fourteenth addresses two different matters, i.e., what constitutes a quorum for meeting purposes and what constitutes the required vote on the particular Business Combination being proposed. The language of the May certificate of incorporation distinguishes between the presence of voting securities and "voting power present". The quorum requirement under Article Fourteenth of May's certificate of incorporation is that not less than 80% of the voting securities of the corporation be *present* in person or in proxy. If a quorum is present, in order for the Business Combination to be approved, Article Fourteenth requires the "affirmative vote of 66–⅔% of the *voting power present*, in person or by proxy." If a stockholder is not present in person, and if he has not given a proxy to vote on the proposed Business Combination, his stock cannot be regarded as "voting power present," for purposes of the vote required under the supermajority provision. The distinction set forth in the May certificate of incorporation is recognized and permitted under Delaware law.

■ Section 216 of the Delaware General Corporation Law expressly contemplates that the number of shares "counted" for quorum purposes need not necessarily be the same as the number of shares required to be "present" for voting purposes. Section 216 provides in relevant part:

Subject to this chapter in respect of the vote that shall be required for a specified action, the certificate of incorporation or bylaws of any corporation authorized to issue stock *may* specify the number of shares and/or the amount of other securities having voting power the holders of which shall be present or represented by proxy at any meeting in order to constitute a quorum for, *and* the votes that shall be necessary for, the transaction of any business, but in no event shall a quorum consist of less than one-third of the shares entitled to vote at the meeting.

8 *Del.C.* § 216 (Supp.1988) (emphasis added). Moreover, the succeeding sentence of Section 216 states:

In the absence of such specification in the certificate of incorporation or bylaws of the corporation:

(1) A majority of the shares *entitled to vote*, present in person or represented by proxy, shall constitute a quorum at a meeting of stockholders;

(2) In all matters other than the election of directors, the affirmative vote of the majority of shares present in person or represented by proxy at the meeting *and entitled to vote on the subject matter* shall be the act of the stockholders;.... *Id.* (emphasis added). Section 216 evidences both a legislative recognition of and an authorization for corporations to differentiate between the greater "universe" of voting shares which are necessary to satisfy a quorum requirement and the "universe" of shares present in person or by proxy "entitled to vote on the subject matter." 8 *Del.C.* § 216; *Providence and Worcester Co. v. Baker*, Del.Supr., 378 A.2d 121 (1977); *see also*, 1, E. Folk, R. Ward & E. Welch, *Folk on the Delaware General Corpora-*

tion Law, § 216.1–.3 (2d ed. 1988). The recognition of these different "universes" is a corollary to a stockholders right not to attend a meeting, his right not to vote on any matter, even if he is in attendance, and his right to be represented by a general or a limited proxy.

■ Under Delaware law, a stockholder has no obligation to attend a meeting. *In re Pioneer Drilling Co.*, Del. Ch., 130 A.2d 559 (1957). However, it is also firmly established that stockholders who are present at a meeting are properly counted in the determination of a quorum *even though the shares are not voted. Duffy v. Loft, Inc.*, Del. Ch., 151 A. 223, *aff'd*, Del.Supr., 152 A. 849 (1930). *But see Leamy v. Sinaloa Exploration & Development Co.*, Del. Ch., 130 A. 282 (1925). A stockholder can be present for quorum purposes and yet not vote, because a stockholder has a right to attend the meeting but has "no legal duty to vote at all." *Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Ringling*, Del.Supr., 53 A.2d 441, 447 (1947). It follows logically that a stockholder who is present in person at a meeting has a right to withhold his vote on any particular proposal and, in fact, can leave the meeting. However, a stockholder who is counted in reaching a quorum, cannot defeat the quorum, once established, by not voting or by walking out of the meeting. *Duffy v. Loft, Inc.*, Del.Supr., 152 A. 849, 853 (1930).[13]

■ A stockholder also has the right to be represented at a meeting by giving a general or a limited proxy. 8 *Del.C.* § 212. "[T]he presence of holders of proxies at a meeting renders the shares that they represent present for purposes of a quorum, regardless of whether the written proxies are produced." 1, R.F. Balotti & J. Finkelstein, *The Delaware Law of Corporations*

*and Business Organizations* § 7.15 at 361 (citing *Atterbury v. Consolidated Coppermines Corp.*, Del. Ch., 20 A.2d 743 (1941); *Hexter v. Columbia Baking Co.*, Del. Ch., 145 A. 115 (1929); *Hauth v. Giant Portland Cement Co.*, Del. Ch., 96 A.2d 233 (1953)). *See also, Duffy v. Loft, Inc.*, 152 A. at 852–53. Just as the quorum once established, will not be defeated by a stockholder who participates in part of the meeting but does not vote or leaves the meeting, it also will not be defeated merely because the stockholder who is present by proxy did not provide authority for his representative to vote on all proposals. *See Duffy v. Loft, Inc.*, 151 A. at 226–28.

■ Nevertheless, a stockholder who is present by proxy for quorum purposes may not be voting power present for all purposes. Voting power present is synonomous with the number of shares represented which are "entitled to vote on the subject matter." 8 *Del.C.* § 216(2) (Supp. 1988). A stockholder who is present in person *or* represented at a meeting by a *general* proxy, is present for quorum purposes *and* is also voting power present on all matters.ʲ However, if the stockholder is represented by a *limited* proxy and does not empower its holder to vote on a particular proposal, then the shares represented by that proxy cannot be considered as part of the voting power present with respect to that proposal.

■ Therefore, unless the certificate of incorporation provides to the contrary, the legal and practical effect of executing a limited proxy is that a stockholder will contribute to the establishment of a quorum and will be bound by a majority decision of the voting power present on a proposal from which he has withheld the authority to vote. 8 *Del.C.* §§ 212, 216 (1983 &

---

13. In *Duffy*, the Chancellor determined that certain proxy holders, who were present at the beginning of a stockholders meeting and whose shares were counted in reaching a quorum, could not defeat the quorum, once established, by walking out of the meeting. *Duffy v. Loft, Inc.*, 151 A. at 228. In affirming, this Court said: "If the owners of the stock, the principals, could not break a quorum by withdrawing from the meeting, certainly their agents could not do

it by withdrawing." *Duffy v. Loft, Inc.*, 152 A. at 853. *See also, Atterbury v. Consolidated Coppermines Corp.*, 20 A.2d at 749; W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 2013.1 at 106 (rev. perm. ed. 1987) ("Where a quorum is once present to organize a shareholders' meeting, it is generally not broken by the subsequent withdrawal of a part or faction of the shareholders, whether present in person or by their proxies....").

Supp.1988). That choice is for each stockholder to make. In making that choice, each stockholder must evaluate the advantages and disadvantages of a limited proxy.

That choice is often made, and its practical effects are frequently seen, when a stockholder decides that it is not convenient to be the "holder of record" of his own stock. *See* 8 *Del.C.* § 262 (1983 & Supp. 1988). Shares of publicly traded corporations are often held in the name of brokers or fiduciaries (commonly called "street name") for the account of the beneficial owners. The brokers or fiduciaries are the stockholders of record.

■ Delaware law expressly recognizes the right of the corporation to rely upon record ownership, not beneficial ownership, in determining who is entitled to notice of and to vote at the meetings of stockholders. *See*, 8 *Del.C.* § 213(a) (Supp.1988); *Enstar Corp. v. Senouf,* Del.Supr., 535 A.2d 1351, 1356 (1987). "[I]n dealing with its stockholders a Delaware corporation need not look beyond the registered owners." *Williams v. Sterling Oil of Oklahoma, Inc.,* Del. Ch. 267 A.2d 630, 634 (1970), *rev'd on other grounds,* Del.Supr., 273 A.2d 264 (1971). Therefore, from the perspective of the Delaware corporation, a broker who is the stockholder of record, has the legal authority to vote in person or by proxy on all matters.

Nevertheless, the relationship between a broker, who is the "record owner", and the beneficial owner is governed by the rules of the various stock exchanges.[14] *American Hardware Corp. v. Savage Arms Corp.,* Del.Supr., 136 A.2d 690 (1957). In certain instances, the brokers may vote the street name stock in their own discretion. However, with respect to other matters, such as the merger proposal presented to the May stockholders, the brokers must obtain specified instructions from the beneficial owner before the broker can vote, or give a proxy, on these nondiscretionary matters.[15]

These stock exchange rules further provide that where a proxy form contains both discretionary and nondiscretionary proposals, the broker may vote, or give a proxy to vote, in the absence of instructions from the beneficial owner if the broker physically crosses out those portions where it does not have discretion.[16] However, where a proposal is nondiscretionary and the broker or fiduciary record holder receives no instructions from the beneficial owner, *voting power* on that proposal has been withheld. The shares represented by a limited proxy cannot be considered as part of the voting power present on a nondiscretionary proposal from which power has been withheld by crossing it out or otherwise.

We find that the inspectors of election properly excluded the 1,329,958 shares, as to which voting power was withheld on Proposal One (the merger), from the "universe" of voting power present to which the supermajority standard applied.[17] *Cf.*

14. Both the New York Stock Exchange and the American Stock Exchange require member organizations who have received soliciting materials to take certain actions with respect to voting instructions from the beneficial owner of the stock held in "street name." 2 N.Y.S.E. Guide (CCH) ¶¶ 2451–2452; 2 Am. Stock Ex. Guide (CCH) ¶¶ 9528–9529. *Cf.* NASD Rules of Fair Practice, Art. III, § 1, Interpretation .05, Section 4, NASD Manual (CCH) ¶ 2151.05 at 2038. *See also Enstar Corp. v. Senouf,* Del.Supr., 535 A.2d 1351 (1987).

15. For example, New York Stock Exchange Rule 452.11 provides in pertinent part:

Generally speaking, a member organization may not give a proxy to vote without instructions from beneficial owners when the matter to be voted upon: ... (3) relates to a merger....

2 N.Y.S.E. Guide (CCH) ¶ 2452.11 supplementary material at 3809–11; *see also,* 2 Am. Stock Ex. Guide (CCH) ¶ 9529.11 commentary at 2721–23.

16. *See, e.g.,* 2 N.Y.S.E. Guide (CCH) ¶ 2452.12 supplementary material at 3811 ("the member organization may vote the proxy in the absence of instructions if it physically crosses out those portions where it does not have discretion.").

17. Emerald argues that Proposal Two was also nondiscretionary and, therefore, could not be voted on by a broker who was the record holder without instructions from the beneficial owner. If the stockholder of record was a broker, and the broker cast a vote on Proposal Two, the corporation was not required to look beyond the registered owner. "The corporation ought not to be involved in possible misunderstand-

*Fradkin v. Ernst,* 571 F.Supp. 829, 840 (N.D.Ohio 1983); *Bank of New York Co. v. Irving Bank Corp.,* 140 Misc.2d 508, 531 N.Y.S.2d 730 (N.Y.Sup.Ct.), *aff'd,* 533 N.Y.S.2d 411 (N.Y.A.D. 1 Dept.1988). We also find that the inspectors of election were correct in counting *all* voting securities which were represented in person or by proxy at the meeting as present for purposes of the "greater universe" or the quorum requirement set forth in Article Fourteenth.

Once a quorum was established, Article Fourteenth provided that 66–⅔% of the voting power present (those entitled to vote on the subject) had to vote affirmatively to approve the merger. Accordingly, we conclude that the quorum requirement and the voting power provision of Article Fourteenth were correctly applied and were, in fact, satisfied in this case. For this alternate reason, the decision of the Court of Chancery to enjoin the merger is REVERSED.

HORSEY, Justice, concurring in part and dissenting in part:

I dissent from the majority's ruling that the supermajority voting requirement contained in Article Fourteenth of May's charter did not apply to the proposed merger with the Hall corporations. However, I concur in that portion of the Court's decision which finds that the shareholder vote was sufficient to satisfy the quorum requirement and the supermajority voting requirement of Article Fourteenth.

Thus, I would affirm the Court of Chancery's construction of May's charter's supermajority provision; namely, that the date for determining its application to the beneficial owner of 30% or more of May's voting securities is the date on which the business combination proposed by such controlling owner (Craig Hall) was approved by May's board of directors and not the date of submission of the merger agreement to the stockholders for adoption

or rejection, pursuant to 8 *Del.C.* § 251. For a supermajority provision such as Article Fourteenth to be efficacious, it must be found to become operable at the time of board action, and thereafter to remain in place until the procedures of Section 251 have been carried out.

Article Fourteenth provides that a supermajority quorum and vote requirement for shareholder approval applies to any of the defined "Business Combinations" involving a 30% or more shareholder unless the board of directors "shall have *authorized*" such combination "prior to the time" that such person became a 30% holder of May's voting securities (emphasis added). On the date that May's board adopted and approved, and thereby "authorized" the Hall merger, Craig Hall not only owned 52% of May's stock but stood on both sides of the transaction by virtue of his 100% control of the Hall corporations. Therefore, in my view, under the plain language of Article Fourteenth, its supermajority quorum and vote requirement then attached.

Attachment at time of board approval, rather than at time of shareholder vote, also appears to be consistent with the underlying purpose of May's board in proposing Article Fourteenth to its shareholders in its 1977 Proxy Statement. That stated purpose was, as plaintiff notes, the protection of minority stockholders from business "transactions [that] are not effected through arms-length bargaining." Since the terms and conditions of a corporate transaction are set by a board and not by its stockholders, the relevant date for triggering a supermajority provision should be the date of board approval of the business combination or transaction. The *raison d'etre* for such a provision is, as plaintiff argues, "the presumptive inability of [a] board to conduct genuine, arms-length negotiations with a controlling stockholder."

The defendants themselves originally adopted this construction of Article Fourteenth as applied to this transaction. In

---

ings or clashes of opinion between the non-registered and registered holder of shares. It may rightfully look to the corporate books as the sole evidence of membership." *Salt Dome Oil Corp.*

*v. Schenck,* Del.Supr., 41 A.2d 583, 589 (1945). This principle was reaffirmed in *Enstar Corp. v. Senouf,* 535 A.2d at 1356.

their proxy statement, issued February 16, 1988, defendants stated, "The transaction was *originally structured* to comply with Article Fourteenth's requirements; however, Mr. Hall subsequently decided to *seek* to obviate the applicability of the supermajority voting requirements of Article Fourteenth by reducing his ... beneficial ownership of May common stock below 30%." The purpose of the special meeting of May's stockholders was also stated to be "[t]o consider and vote upon a proposal to adopt an Amended and Restated Agreement and Plan of Merger, dated November 30, 1987...." Thus, November 30, 1987 was represented to be the date that the plan of merger was authorized by the May board. Hence, Article Fourteenth by its terms attached since as of that date, and well prior thereto, Craig Hall's holdings of May well exceeded 50% of May's outstanding stock.

While a merger is not completed unless approved by the stockholders, the majority's initialruling may be construed as permitting a controlling shareholder to influence, if not dominate, a corporate transaction and thereafter reduce his shareholdings to avoid the requirement of a supermajority vote to ratify. That did not happen in this case, but the precedent will be available for its application in a future case. I fear the Court's decision will send the wrong signal that a supermajority voting provision adopted by shareholders may be avoided by an act of divestment of shares after the controlling shareholder has exercised his dominance to secure board approval of a transaction.

One standard should apply to manipulative conduct affecting corporate governance, whether practiced by a controlling insider or an outsider bent on a takeover. Such conduct should not be acquiesced in, especially where the controlling shareholder times his divestment of shares to "turn off" the supermajority voting requirement to follow, not precede, his exercise of dominance to secure board approval of the transaction. The supermajority vote protective device is indisputably designed to provide shareholders with a greater control over corporate management decisions af-

fecting the investment interests of the minority or non-management shareholders. This being a class or derivative claim, the fact that this plaintiff appears to have a motive of self-interest in enforcing the supermajority vote provision is irrelevant to the determination of this significant legal question. There are other minority shareholder interests involved.

Finally, it should be noted that this Court's Order of remand dated August 15, 1988 stated that "the parties to the merger may proceed at their own risk." This being an interlocutory appeal, there may remain for determination by the trial court several issues raised below but not decided, including the fairness of the merger in terms of price or exchange ratio and whether the shareholder vote ratifying the merger was fairly effected by stockholders who were fully informed consistent with *Michelson v. Duncan,* Del.Supr., 407 A.2d 211 (1979).