**Robert LOBATO and LeAnn Lobato, Plaintiffs,**

v.

**HEALTH CONCEPTS IV, INC., a Delaware corporation, Jack F. Lewis, Mike D. Case and Howard Brenneman, Defendants.**

Civ. A. No. 12203.

Chancery Court of Delaware, New Castle County.

Submitted Sept. 9, 1991.
Decided Oct. 29, 1991.

David C. McBride, and Josy W. Ingersoll, of Young, Conaway, Stargatt & Taylor, Wilmington, Of Counsel: David W. Holden, Ronald E. Goins, and Ellen E. Gallagher, of Holliman, Langholz, Runnels & Dorwart, Tulsa, Okl., for plaintiffs.

R. Franklin Balotti, Thomas A. Beck, and David L. Finger, of Richards, Layton & Finger, Wilmington, for defendants.

## OPINION

BERGER, Vice Chancellor.

Robert and LeAnn Lobato (collectively "Lobato") filed this action pursuant to 8 *Del.C.* § 225 to determine whether defendants Jack F. Lewis ("Lewis"), Mike D. Case and Howard Brenneman were validly elected directors of defendant Health Concepts IV, Inc. ("HCIV"). The election in question took place at an annual meeting on June 19, 1991, and the sole issue is whether there was a quorum at that meeting. There were 2,779,650 HCIV shares outstanding as of the record date and, pursuant to the company's bylaws, a majority of the outstanding shares constitutes a quorum. Thus, 1,389,826 shares were needed. According to the report of the inspectors of election, there were 1,433,718 shares present by proxy. However, the inspectors' tally included 175,000 shares held of record by Lewis' former wife, Cecilia Lewis. Lobato contends that those 175,000 shares should not have been included in the quorum determination.

The relevant facts may be summarized as follows. From 1984 until the spring of 1991, Lobato and Lewis were the top executive officers and largest stockholders of HCIV and related companies. In April, 1991, as the result of "management differences," Lobato resigned as director and chief financial officer of HCIV. Lobato thereafter engaged in a proxy contest in an effort to gain control of the HCIV board. Apparently Lobato's proxy solicitation was unsuccessful, since Lobato deliberately stayed away from the annual meeting in an attempt to block a quorum.

With a control fight thus underway, Lewis checked with his attorney to be sure that he would be able to vote the 175,000 shares at issue registered in the name of his former wife. He was advised that no separate proxy was required. Accordingly, Lewis purported to vote the 175,000 shares in question by the authority granted him in a property settlement agreement (the

"Agreement") executed by Mr. and Mrs. Lewis on May 10, 1991, in connection with their divorce. The Agreement provides in relevant part:[1]

4. PROPERTY DIVISION

\* \* \* \* \* \*

b. Wife shall have set aside to her as her sole, separate and distinct property, free and clear of any and all claims of Husband, all of the following:

\* \* \* \* \* \*

(2) The 175,000 shares in Health Concepts IV, Inc., which are currently titled in her name, and in her possession and/or under her control; and an additional 175,000 shares in Health Concepts IV, Inc., which are currently titled in Husband's name and in his possession and/or under his control, for a total of 350,000 shares in Health Concepts IV, Inc. which Husband shall transfer to Wife forthwith.

Husband shall retain for two years from the signing of this Agreement the voting rights to all of the above shares of stock in which Wife has any beneficial interest, whether held in Wife's name prior to the filing of this divorce action, or transferred to her by operation of this Agreement, except if Wife elects to sell certain of her shares in accordance with this agreement she may sell those shares with the voting rights free of Husband's right to vote those shares.

To effectuate the parties' intent, Wife shall execute a proxy designating Husband as the person authorized to vote Wife's stock on all issues and for all purposes for said stated two-year period of time.

Defendants' Ex. 2, p. 4–5 (cited hereafter as Agreement, ¶ ——). Cecilia Lewis never executed a formal proxy designating Lewis as the person authorized to vote her shares. However, Lewis kept a copy of the Agreement in his desk at the office and testified that he was prepared to let stockholders or other authorized persons review the provisions quoted above in order to establish Lewis' authority to vote Cecilia Lewis' shares. In fact, such a review took place at the June, 1991 annual meeting.

Lewis, the chief executive officer of HCIV, acted as chairman of the annual meeting. He requested that all persons having proxies deliver them to William B. Morgan ("Morgan"), who is counsel to HCIV and served as secretary of the meeting. No one was identified as voting in person and the proxies that were delivered to Morgan included one executed by Lewis. However, neither the entire Agreement or the portion quoted above was delivered to Morgan as a proxy. The inspectors of election then retired to another room to count the proxies. Lewis' proxy authorized HCIV officers to vote all of the shares of common stock held of record in his name in the manner designated. Lewis was listed on the HCIV stocklist as the record owner of 700,100 shares. Nonetheless, his proxy was counted as representing 875,100 shares after one of the inspectors of election was told by HCIV's director of investor relations that Lewis was entitled to vote Cecilia Lewis' shares pursuant to the divorce decree.

After the election inspectors announced that there was a quorum, Ronald E. Goins, Esquire ("Goins") protested and asked to see the proxy for Cecilia Lewis' shares.[2] According to Goins, Morgan's first response was to provide Goins a copy of Lewis' proxy. When Goins questioned the fact that Lewis' proxy did not bear the signature of Cecilia Lewis, Morgan explained that Lewis had the authority to sign a proxy on behalf of Cecilia Lewis under the terms of the divorce decree. After Goins was allowed to see the relevant

---

1. Defendants have refused to provide plaintiffs a copy of the entire Agreement on the ground that other substantive provisions deal with private matters pertaining to the divorce that are wholly irrelevant. Although plaintiffs have focused some attention on the Agreement's confidential nature and Lewis' refusal to provide an unredacted copy, they never moved to compel production of the entire Agreement.

2. Goins had been appointed by Lobato to serve as proxy for two HCIV stockholders. After the annual meeting, Goins was retained as Lobato's counsel.

portion of the Agreement and noted the language about Cecilia Lewis executing a proxy in favor of her husband, Goins again asked to see Cecilia Lewis' proxy. At that point, according to Goins, Morgan stated that Cecilia Lewis had not signed a proxy but that the Agreement itself constituted a valid proxy.

Plaintiffs urge several reasons why the Agreement is not a proxy. First, they note that the Agreement does not contain language appointing Lewis (or anyone else) to act on Cecilia Lewis' behalf with respect to the HCIV stock registered in her name. Rather, the Agreement expressly provides that Cecilia Lewis was to execute a proxy designating Lewis as the person authorized to vote her shares. Second, plaintiffs argue that the Agreement could not be a proxy because the provisions concerning voting rights are conditioned upon performance of other provisions in the Agreement. Specifically, paragraph 14 of the Agreement provides:

> The terms on stock transfers, stock sales, voting rights, indemnification, and maintenance in this Agreement are co-dependent, and "of the essence" of this Agreement, such that if any of the agreements in paragraphs 4(b)(2), 4(c), 4(d), 5, 6, 7, or 13 not be performed, then further performance in those paragraphs is waived; the division of property and maintenance set forth in this Agreement shall be rendered a nullity....

Plaintiffs argue that this language makes it impossible for inspectors of election to determine whether the grant of voting rights to Lewis remained in effect at the time the Agreement is presented as a proxy. In fact, Lewis testified that he had not performed at least one of the "co-dependent" terms of the Agreement at the time of the annual meeting in that he had not transferred 175,000 shares of stock to Cecilia Lewis' name.

If there were any question as to the parties' intent, plaintiffs argue that defendants' actions defeat their claim that the Agreement is a proxy. Lewis has vigorously opposed disclosure of the very private matters included in the Agreement.

It makes no sense, according to plaintiffs, to include confidential provisions in a document that must be provided to the corporation for inspection by election officials and stockholders. Moreover, plaintiffs point out that the Agreement was *not* submitted to Morgan along with all other proxies at the beginning of the annual meeting. It was only after questions were raised that the Agreement was retrieved from another office and the relevant portions were shown to the objecting attorneys.

Plaintiffs say that the relevant descriptions in the company's communications with stockholders confirm what is otherwise apparent—that the Agreement was never considered the proxy until it became necessary to view it that way as a result of this litigation. The HCIV proxy statement dated May 20, 1991, states that the Lewis' reached a settlement in connection with their divorce pursuant to which, among other things, "Mrs. Lewis has agreed to execute a proxy designating Mr. Lewis as the authorized person to vote, in his discretion, each of the 350,000 shares then standing in Mrs. Lewis' name." Plaintiffs' Ex. 12, p. 4. After this lawsuit had been filed, the same type of description in HCIV's opposition to Lobato's consent solicitation was worded differently. The solicitation in opposition states that "Mrs. Lewis designated Mr. Lewis as the authorized person to vote, in his discretion, each of the 350,000 shares then standing in Mrs. Lewis' name." Plaintiffs' Ex. 5, p. 6.

Even if the Court were to find that the Agreement suffices as a proxy, plaintiffs contend that it was not properly used as such at the annual meeting. The Agreement was not delivered to the inspectors of election either before or after they counted proxies to determine the presence of a quorum. Plaintiffs read 8 *Del.C.* § 231 as requiring such delivery before a proxy may be counted. In addition, 8 *Del.C.* § 212(d) requires that, if a copy of a proxy is to be relied upon, it must be a complete copy of the entire original document. Here, only selected portions of the Agreement were made available to Goins and only those same portions would have been made available to the election inspectors if requested

by them. Finally, plaintiffs argue that the Agreement could not have been used as a proxy because the Agreement had become a nullity by the time of the annual meeting.

Defendants counter each of these arguments and raise a few additional issues such as lack of standing and failure to join indispensable parties. However, the heart of their argument is that any document evidencing an agency relationship may be used as a proxy. Although the Agreement does not look like the more standard form of proxy, defendants say that it may be used as one because it was signed by Cecilia Lewis and includes a provision granting Lewis the right to vote Cecilia Lewis' shares "for two years from the signing of this Agreement...." Agreement, ¶ 4(b)(2). The provision requiring Cecilia Lewis to execute a proxy in her husband's favor is not controlling, according to defendants, because paragraph 8 of the Agreement requires each party to furnish the other with necessary instruments of title or disclaimers to transfer "any interest in any property mentioned in this Agreement...." If either party refuses, then the Agreement "shall act as such instrument or conveyance in order to effect the purposes and intent of [the] Agreement." While it is true that Lewis never asked his former wife for a proxy, defendants say that a court of equity should not allow a mere formality to interfere with Lewis' voting rights.

Given the language in the Agreement, it is difficult to conclude that the parties intended the Agreement to act as a proxy. If they had, there would be no reason to include language stating that Cecilia Lewis "shall execute a proxy...." It is, likewise, difficult to imagine that the parties would choose to use a personal and confidential document like the Agreement as a proxy when standard form proxies are readily available and would eliminate the risk that corporate officials or stockholders might see some of the confidential provisions in the Agreement. However, the fact that the Agreement was not originally intended to serve as a proxy does not necessarily prevent it from being used as one.

Delaware law does not require that a proxy be in any particular form. *Parshalle v. Roy*, Del.Ch., 567 A.2d 19 (1989). "The paper writing which we call a proxy is nothing more than evidence of a relationship. It is not the relationship. It simply testifies that A. has constituted B. his agent to act for him in a vicarious capacity." *Duffy v. Loft, Inc.*, Del.Ch., 151 A. 223, 227, *aff'd*, Del.Supr., 152 A. 849 (1930). To qualify as a proxy, the document must appoint someone to vote the shares, *Concord Financial v. Tri–State Motor Tr.*, Del.Ch., 567 A.2d 1, 13 (1989), and it must include some indication of authenticity, such as a signature. *Parshalle v. Roy*, 567 A.2d at 27.

I conclude that the Agreement meets both of those requirements. First, it was signed by Cecilia Lewis. Second, in paragraph 4(b)(2), the Agreement identifies Lewis as the person authorized to vote Cecilia Lewis' stock and, pursuant to paragraph 8, the Agreement may be used as the proxy in order to carry out the parties' purposes and intent.[3] *Cf. Ringling Bros.– Barnum & Bailey Com. Shows v. Ringling*, Del.Supr., 53 A.2d 441 (1947) (where, among other differences, the agreement in question did not contain a clause similar to paragraph 8 of this Agreement authorizing the use of the document in lieu of a proxy.) The fact that the Agreement may be voidable under certain circumstances does not detract from its validity as a proxy. Most proxies are revocable, yet election inspectors accept them without question unless

3. Paragraph 8 speaks in terms of instruments of title or disclaimers necessary to transfer any interest in property covered by the Agreement to the other party. Cecilia Lewis' HCIV stock is property, and the right to vote that stock is an interest in property. The fact that Lewis never requested his former wife to provide a proxy is not dispositive. The Agreement, read as a whole, expresses the parties' intent to appoint Lewis as the person to vote Cecilia Lewis' stock. That intention was to be carried out either by obtaining a proxy, as provided in paragraph 4(b)(2), or by using the Agreement itself, as provided in paragraph 8. Since in either case Lewis would have the authority to vote his former wife's shares, the requirement in paragraph 8 that Lewis first request the proxy seems to be nothing more than a formality.

they are actually revoked by a later proxy. By analogy, the Agreement should be accepted by election inspectors unless Cecilia Lewis purports to revoke the proxy.

Having determined that the Agreement may substitute as a proxy, the question then becomes whether it was properly used as one at the annual meeting. Plaintiffs argue that under 8 *Del.C.* § 231, a new section of the Delaware General Corporation Law, all proxies must be delivered to the election inspectors in order to be counted towards a quorum and it is undisputed that the Agreement was not. It had been settled law that, " '[T]he presence of holders of proxies at a meeting renders the shares that they represent present for purposes of a quorum, regardless of whether the written proxies are produced.' " *Berlin v. Emerald Partners*, Del.Supr., 552 A.2d 482, 493 (1989), *quoting* 1 R.F. Balotti and J. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 7.15 at 361 (1988); *see also Duffy v. Loft, Inc.*, 152 A. at 852. Plaintiffs argue that this case law was overruled by the enactment of 8 *Del.C.* § 231. If so, the failure to submit the Agreement to the election inspectors defeated the quorum.

A statute will be construed as having changed the common law only where such a result is "clearly indicated by express terms or by necessary implication from the legislative language used." *Makin v. Mack*, Del.Ch., 336 A.2d 230, 234 (1975); 2A *Sutherland Stat. Const.* § 50.05 (4th Ed.). Section 231(b)(2) provides that "inspectors shall ... [d]etermine the shares represented at a meeting and the validity of proxies and ballots...." In determining the validity of the proxies, the inspectors are limited, in most circumstances, to an examination of the proxies, envelopes and the regular books and records of the corporation. § 231(d).

Nothing in the language of § 231 requires that proxies be presented as part of the determination of the presence of a quorum. It would have been a simple matter for the general assembly to include such language if the statute was meant to change existing common law. Indeed, in the two areas where § 231 did modify the common law, the commentary provided as legislative history specifically notes the impact of the statute on existing law. *See* Commentary on Section 231, Senate Bill No. 467 (June 12, 1990). Accordingly, I conclude that Lewis' failure to present the Agreement to the inspectors does not defeat the quorum at the HCIV annual meeting.

Plaintiffs' second statutory argument is that the Agreement may not be counted as a proxy since the entire document was not provided or available to the election inspectors. Pursuant to 8 *Del.C.* § 212(d), a copy or other reproduction of a proxy may be used, "provided that ... [it] shall be a complete reproduction of the entire original writing or transmission." Defendants question whether § 212(d) is applicable, but say that if it is, the statute has been satisfied because the entire proxy portion of the Agreement was available for inspection. I find it to be an academic question whether a copy of portions of the Agreement would have satisfied § 212(d). The fact is that the Agreement was never presented to the inspector of elections either in whole or in part, in its original form or as a copy. Accordingly, I decline to interpret § 212(d), as such an interpretation would constitute an advisory opinion.

Finally, plaintiffs argue that the Agreement had become inoperative by the time of the annual meeting because of Lewis' failure to transfer certain stock into his former wife's name. It is not at all clear that plaintiffs have standing to raise this type of argument. It is one thing for stockholders to question, as did plaintiffs, whether a particular document constitutes a proxy. It is another for third party stockholders to argue that the Agreement has been breached when the parties to the Agreement apparently are treating it as fully operative. In any event, I find plaintiffs' argument unpersuasive. Lewis testified that he did not accomplish the task of transferring his stock into his former wife's name by the time of the annual meeting because he was attending to other, more pressing matters. In other words,

what plaintiffs call non-performance, Lewis considers a delay in performance. There is no evidence that Cecilia Lewis was troubled by the delay or that she considered it to be non-performance within the meaning of paragraph 14 of the Agreement. Thus, the evidence does not support the conclusion that the Agreement had become a nullity by the time of the meeting.

Based on the foregoing, I find that there was a quorum present at the HCIV meeting held on June 19, 1991. There being no other challenge to the election that was conducted at that meeting, I also find that the three named defendants were validly elected as directors of HCIV. IT IS SO ORDERED.