William Waller YOUNG, Jr., Warren M. Simon, Jean Mason Smith, Peggy M. S. Fleming and Elise M. S. Howard, Plaintiffs,

v.

VALHI, INC., Contran Corporation and Vis Corp., all Delaware Corporations, Defendants,

Daniel BRUNO, Plaintiff,

v.

CONTRAN CORPORATION, Harold C. Simmons and Valhi, Inc., Defendants.

Court of Chancery of Delaware, New Castle.

Submitted Jan. 17, 1978.

Decided Feb. 22, 1978.

Steven J. Rothschild and David B. Ripsom of Prickett, Ward, Burt & Sanders, Wilmington, and Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for plaintiffs in Civil Action No. 5430.

Arthur G. Connolly, Jr. of Connolly, Bove & Lodge, Wilmington, and Ronald Litowitz of Kreindler & Kreindler, New York City, for plaintiff in Civil Action No. 5428.

A. Gilchrist Sparks, III of Morris, Nichols, Arsht & Tunnell, Wilmington, and Fred H. Bartlit, Jr. of Kirkland & Ellis, Chicago, Ill., for defendants.

MARVEL, Chancellor.

Since May, 1975 plaintiffs have been the owners of 12,380 shares of common stock of the defendant Valhi, Inc. out of 157,070 issued and outstanding such shares[1] of said corporation held by stockholders other than the defendant Contran Corporation, the majority holder of common shares of Valhi, which, as of March 31, 1977, held a 55%[2] interest in the common stock of such corporation, an interest which made up approximately 92% of Contran's assets computed on a consolidated basis as of that date. Contran's other assets consisted of a land development and investment company which owned some 1800 acres of farm land in Arkansas and a lake front development in Texas. Contran has thus been operated and is being presently operated essentially as a holding company, 40.4% of the common stock of which is beneficially owned by Harold C. Simmons, an officer and director of such corporation as well as chairman of the board and president of Valhi, which, since its incorporation in June 1971 and operation thereafter, first as a division of Southdown, Inc. until its spin-off in 1975, has failed to report any earnings. Furthermore, it has no foreseeable expectation of reporting net earnings. The question now before the Court is whether or not the proposed merger of the subsidiary, Valhi, into its parent, Contran, accomplished by the vote of the stock of the subsidiary held by the parent meets the test of being entirely fair to the minority stockholders of Valhi after a careful scrutiny of the evidence by the Court. This is the opinion of the Court after final hearing.

According to counsel for Contran, both it and its subsidiary, Valhi, are in a period of transition, the latter having recently been caused by Contran to dispose of unprofitable assets and thereafter caused to acquire an interest in two business enterprises emerging from bankruptcy, arguing that in the future such radical corporate changes will not take place and that Contran merely appears to be an asset converter although in recent years it has disposed of a number of diverse businesses. I am not persuaded, however, that either Contran or Valhi can be considered to be prospective producing companies in the normal sense. Accordingly, the usual tests which apply to competitive manufacturing companies involved in the same field of production when a merger is contemplated cannot, in my opinion, be applied to the present parent and subsidiary, which are clearly not producers but rather corporations engaged in the acquisition and disposal of assets on a speculative basis with no clearcut prospect for either of a foreseeable conventional productive period which might lead to the generating of earnings as a result of the furnishing of goods and/or services.

Mergers have in the past been deemed to be desirable by the courts of Delaware, and

1. There are presently issued and outstanding a total of 443,203 shares of Valhi.

2. Contran as of the time of trial of this consolidated action held approximately 64.6% of the common stock of Valhi.

in fact have been " * * * encouraged and favored * * * " by this Court, *MacFarlane v. North American Cement Corp.*, Del.Ch., 157 A. 396 (1928).[3] In fact, it has been held that merger statutes are enacted

" * * * not in aid of dissenting stockholders alone, but are as well in aid of majority stockholders and also in aid of the public welfare if the notion is not entirely outmoded that healthy business conditions are in some degree conducive to the general good." *Salt Dome Oil Corp. v. Schenck,* Del.Ch., 41 A.2d 583 (1945).

■ However, in the case of mergers in which the corporate entities involved are tied together by a holding of a majority or more of the stock of one corporation by the other and by the holding of common directorships, the dominant corporation sitting on both sides of a transaction, and thus occupying a fiduciary position, must carry the burden of establishing the entire fairness of a proposed merger when it is subjected to the " * * * test of careful scrutiny by the courts * * * ", *Sterling v. Mayflower Hotel Corp.,* Del.Supr., 93 A.2d 107 (1952). Next, in the recent case of *Singer v. Magnavox Company,* Del.Supr., 380 A.2d 969 (1977), the Supreme Court of Delaware held:

"By analogy, if not a fortiori, use of corporate power solely to eliminate the minority is a violation of that [fiduciary] duty. Accordingly, while we agree with the conclusion of the Court of Chancery that this merger was not fraudulent merely because it was accomplished without any purpose other than elimination of the minority stockholders, we conclude that, for that reason, it was violative of the fiduciary duty owed by the majority to the minority stockholders.

"We hold, therefore, that a Section 251 merger, made for the sole purpose of freezing out minority stockholders, is an abuse of the corporate process; and the complaint, which so alleges in this suit, states a cause of action for violation of a fiduciary duty for which the Court may grant such relief as it deems appropriate under the circumstances.

"This is not to say, however, that merely because the Court finds that a cashout merger was not made for the sole purpose of freezing out minority stockholders, all relief must be denied to the minority stockholders in a Section 251 merger. On the contrary, the fiduciary obligation of the majority to the minority stockholders remains and proof of a purpose, other than such freeze-out, without more, will not necessarily discharge it. In such case the Court will scrutinize the circumstances for compliance with the Sterling rule of 'entire fairness' and, if it finds a violation thereof, will grant such relief as equity may require. Any statement in Stauffer inconsistent herewith is held inapplicable to a Section 251 merger."

In May, 1975 when a substantial number of shares of Valhi became available for acquisition after such corporation's spin-off from Southdown, Inc., the prospectus issued in connection with the offering of such shares for purchase came to the attention of Mr. Harold C. Simmons, who, acting for Contran, quickly recognized Valhi as a potentially desirable acquisition for Contran, thereafter entering into a contest with Farnham Corporation[4] for its control and eventually gaining such control by purchasing 286,133 shares of Valhi at a price of approximately $27.50 per share (thereafter returning between 50,000 to 70,000 shares of tendered stock) at an aggregate cost of $7,870,000 plus expenses.

---

**3.** "In the absence of any evidence of fraud, bad faith or intentional wrongdoing, there must be a presumption that those favoring the merger are acting honestly, according to their best judgment and for the advantage of the companies they seek to consolidate."

**4.** A corporation organized by the McCarthy brothers who were then involved in the management of Valhi. However, Farnham Corporation was enjoined from proceeding with its effort to gain control of Valhi, thus leading to a successful take-over by Contran.

Upon taking over control of Valhi in August 1975, Mr. Simmons through Contran proceeded to liquidate Valhi's unprofitable Australian cattle operation, a project which had been plagued by drought and mismanagement as well as by a Japanese meat embargo, at a pre-tax loss of $9,000,000. He also disposed of Valhi's interest in a joint venture in unprofitable agricultural projects carried on in California in partnership with Prudential Insurance Company as to which mismanagement and drought had also contributed to near disaster with a resulting cash drain for said project for the year 1976 of $2,000,000. As a result of the disposal of such agricultural interests Valhi became the owner of a ten year $36,000,000 non-recourse note designed to offset payment on a $36,000,000 full-recourse note owed by Valhi to Prudential. At this juncture, however, it should be noted that the two year California drought, which was a principal factor in the failure of the joint agricultural partnership embarked on with Prudential Insurance Company, has come to an end, thus providing reasonable assurance that Valhi will not become liable for further loss in the venture. Unprofitable oil and gas leases in Louisiana were also disposed of with a resulting write-off of $4,500,000. Having made such disposals, Mr. Simmons, casting about for acquisitions to replace the liquidated unprofitable ventures of Valhi, proceeded to purchase at a cost of $34.81 per $100, $18,900,000 principal amount of outstanding 6.5% subordinated debentures of Omega-Alpha, a business organization emerging from a reorganization in bankruptcy and faced with several major law suits but appearing to hold a promise of speculative profits if the goal of gaining control of Okonite, a wire and cable manufacturer in which Omega-Alpha has an interest is achieved. In fact, according to the testimony of Mr. Harold C. Simmons, such acquisition and a later and similar investment, namely, the purchase of $16,400,000 principal amount of unsecured promissory notes of the bankrupt issuer, North American Acceptance Corporation, a transaction accomplished in return for an outlay of only $6,000,374, had greatly improved the net asset picture of Valhi as of the time of trial and holds out a promise for a brighter future for such corporation.

Contran, which, I am satisfied, from the time of its acquisition of control of Valhi as a result of its 1975 purchase of approximately a 55% interest in such corporation has demonstrated an intent to acquire all or substantially all of the issued and outstanding stock of Valhi, immediately found such purpose made more difficult than in the usual merger of parent and subsidiary under the provisions of 8 Del.C. Section 251 because of a charter provision of Valhi designed to prevent a takeover of such business by a mere majority vote, namely a requirement [5] that the approval of 80% of the issued and outstanding common shares of such corporation be obtained in order to accomplish such corporation's merger with another corporation holding at least 5% of Valhi's stock, nonetheless promptly began to explore ways and means of acquiring the balance of the issued and outstanding common shares of Valhi, first by means of a merger by vote of 80% of the common stock of Valhi, a proposal which failed to receive the requisite vote in November 1976. Following such failure, an attempt was made in January 1977 to persuade the minority stockholders of Valhi to exchange their shares in such corporation for a newly created preferred stock, a class of stock similar to that which would have been issued had the November 1976 merger proposal been consummated except for the fact that such new preferred stock was to be subject to call at any time rather than at a fixed date as proposed in the 1976 merger plan. However, this new proposal also failed of stockholder approval by a larger margin than that voted against the 1976 merger proposal.

The next attempt on the part of Contran to acquire shares of Valhi not held

5. Article Seventh.

by it is contained in the proposal now before the Court, namely a merger proposed to be accomplished by means of an already secured majority vote of shares of Valhi held by Contran rather than by the vote of 80% of the common shares of Valhi so as to cause the merger of Valhi into a recently formed wholly owned subsidiary of Valhi, namely VIS Corp., use being made of another charter provision of Valhi's certificate of incorporation which ostensibly permits the merger of such corporation with a wholly owned subsidiary by a mere majority vote. The requisite majority vote having been obtained for such merger, the filing of such merger papers with the Secretary of State of Delaware has been withheld pending a decision by this Court on the question as to whether or not the obviously interested merger in issue, which provides for the payment of $22.50 to minority stockholders of Valhi and a consequent termination of their further interest in Valhi, is in fact entirely fair to such minority stockholders, *Sterling v. Mayflower Hotel Corp.*, supra, and *Singer v. Magnavox Company,* supra, it also being recognized that minority stockholders may be eliminated by merger if such corporate act also serves a valid business purpose of the parent or its subsidiary, in the cited case to facilitate long term debt financing, *Tanzer v. International General Industries*, Del.Supr., 379 A.2d 1121 (1977), a case which also recognizes the basic right of a stockholder to vote his stock as he pleases.

The proxy statement issued by Contran prior to the stockholder vote here in issue reads in part as follows:

"The principal purpose of the Merger is to permit Contran to own 100% of the Common Stock while, at the same time, to provide fair, reasonable and equitable treatment to Valhi's common stockholders other than Contran through the exchange of $22.50 in cash for each share of Stock held by them.

"The Merger will result in Contran's owning all of Valhi's residual equity, thus permitting it to retain the entire benefit from any future increases therein. In addition, the Merger will permit Contran and Valhi to engage in intercompany transactions, subject to the rights of the holders of Series A Preferred Stock, which might be beneficial to both but which may be inadvisable at present due to potential conflicts of interest between Contran and the other holders of the Common Stock. The potential conflicts of interest between Contran and the interest of the public common stockholders of Valhi create constraints on the operations of both Contran and Valhi. Among other things, these potential conflicts relate to the flow of funds from Valihi to Contran by means of dividends, distributions, loans and other investments, the allocation of administrative and other costs relating to facilities and personnel shared by the two companies in joint operations, such as joint development of real estate, the allocation of potential acquisition opportunities, and the interchange of management personnel between Contran and Valhi. If the Merger is consummated, Valhi's common stockholders other than Contran will have no continuing interest in Valhi. As a result, the Boards of Director of Valhi and Contran will be able to consider and implement actions which they deem advisable or in the best interests of Valhi and Contran so long as the rights and privileges of the holders of the Series A Preferred Stock are not adversely affected. Thus, the potential conflicts of interest referred to above will be minimized or eliminated.

"Another purpose of the Merger is to enable Contran and Valhi to file consolidated income tax returns. Neither Contran nor Valhi will receive any immediate tax benefit upon the consummation of the Merger and the inclusion of Valhi and its subsidiaries in the Contran affiliated tax group. After the Merger, however, Contran and Valhi will be able to offset their future earnings and losses by filing consolidated federal income tax returns.

Such offsets, if and when occurring, might result in lower federal income tax liability for the affiliated group. Moreover, gains or losses on certain intercompany transactions (between Contran and Valhi) will be postponed until transactions outside the Contran and Valhi affiliated tax group occur."

■ Contran's basic contention is that the merger in issue, if permitted to be consummated, will serve two beneficial purposes, namely bring about tax savings and the avoidance of future conflicts of interest. Thus, had the merger in issue been consummated prior to January 30, 1978, it appears clear that there would have been an offsetting of Valhi's recent gains against Contran's continuing losses. It is contended that the same type of tax savings could be anticipated in the future in the event the pending merger is approved. It is also contended, as noted above, that the merger, if consummated, would also eliminate potential conflicts between the interests of the stockholders of Contran as opposed to those of the stockholders of Valhi.

Insofar as tax savings are concerned I am satisfied that had the merger in issue been found to be entirely fair and permitted to be consummated prior to January 30, 1978, Valhi's tax gains of some $3,000,000 resulting from liquidation of its agricultural partnership with Prudential Insurance Company of America, set off against Contran's tax loss carry-forward available for current use in the amount of $500,000, would have effected total tax savings of $150,000, or approximately $.34 per share. However, I am satisfied that such type of tax savings could be achieved by means other than the merger here proposed, namely by acquisition of an 80% interest in the common stock of Valhi by Contran, by the merger of the small Contran[6] into Valhi, or through other corporate acquisitions.

As to the possibility of future conflicts of interest between Contran and Valhi, insofar as business opportunities are concerned, it must be borne in mind that Contran is a holding company, over 90% of the assets of which consist of Valhi's common stock, and that past conflicts of interest, such as the allocation of land development opportunities between such subsidiary and its parent, the employees of which are actually Valhi's with one exception, and its much larger subsidiary, have been minimal. But assuming there to have been minor conflicts of interest in the past as to which of the two corporate entities here involved should have had the opportunity to go into the blueberry business or to develop lots in Arkansas, and assuming similar problems as to which of the two corporations should be offered such a future opportunity, reliance on such principle namely that potential conflicts of interest should be avoided, is, I believe, somewhat contrived in light of the respective sizes of the two corporations here involved and their past inter-corporate dealings in the period which has elapsed since Contran's acquisition of control.

Where the parties basically differ as to the entire fairness of the merger in issue is as to the cash proposed to be paid to the minority stockholders of Valhi, namely the sum of $22.50 per share in return for their elimination as stockholders of Valhi, such price admittedly representing a 50% premium over and above the recent market price of Valhi stock, a price arrived at after painstaking research by Alan A. Moses of Dominick and Dominick, an independent investment banking house, which had earlier found a price of $15 to $16 a share, a figure $2 to $3 above the August 30, 1976 market price, to be fair to Valhi's dissenting minority stockholders under the provisions of the proposed 1976 merger which failed to receive the requisite vote, although, of course, such merger contemplated the issuance to Valhi stockholders of series A preferred stock of Contran rather than cash. It is also pointed out that Valhi's totally inde-

6. Defendants argue that such a merger would be unfeasible in light of litigation pending against Contran.

pendent director, Professor Frame, not only found the 1976 but also the 1977 proposed merger to be fair, reasonable and equitable to the minority stockholders of Valhi.

Plaintiffs argue, however, that market price is not a fair test of value in a merger proceeding such as the one at bar as was the case in *Gibbons v. Schenley Industries, Inc.*, Del.Ch., 339 A.2d 460 (1975) in which a manufacturing company rather than an investment company was to be the resulting corporation, both Contran and Valhi bearing resemblance to investment trusts,[7] the value of the assets of which allegedly constitute the best test of the value of their shares, arguing that on such basis the true value of a common share of Valhi is at least $50 and that the so-called bench mark sale to Valhi by the McCarthys of their 53,364 shares of Valhi at $16 per share was not an arms' length transaction, it being clear at the time that Mr. Harold Simmons had set upon a course of conduct designed to reduce in importance and ultimately to eliminate all minority interests in Valhi, a corporate policy not acceptable to the McCarthys. In short, I am satisfied that the McCarthys, acting earlier through Farnham Corporation, and having managed Valhi's agricultural activities unsuccessfully during a drought period, and having failed to hold control of Valhi in 1975, were content, particularly in light of the then continuing west coast drought, to withdraw from Valhi with the best grace and price possible.

I conclude, however, that it is unnecessary to pass on the overall fairness of the price per share offered to minority stockholders of Valhi or whether or not reasons given for the proposed merger, namely tax savings and avoidance of future conflicts of interest, were largely contrived because having tried the case, examined the exhibits as well as the testimony of the witnesses and considered their demeanor on the stand, I am of the opinion that the basic purpose behind the merger now before the Court is effectuation of a long standing decision on the part of Contran to eliminate the minority shares of Valhi by whatever means as might be found to be workable.

In fact, I am satisfied that the merger before the Court is the prototype of the kind which the Supreme Court now seeks to prevent by its application of strict standards of fiduciary behavior to the conduct of majority stockholders in their dealings with the minority, the ground on which I base my decision as to the relief which should be entered after final hearing having its base in what I believe to have been the use of technically correct but devious corporate action on the part of Contran for the purpose of accomplishing a merger designed to eliminate all minority stockholders of Valhi, namely the proposed circumventing of a charter provision of Valhi for the benefit of minority stockholders, of which Contran had constructive if not actual knowledge at the time of its acquisition of control of Valhi in 1975, namely the requirement that 80% of its stock must vote in favor of a merger with another corporation holding at least 5% of its shares. By seeking to evade such charter provision through the formation of the subsidiary, VIS Corp., all of the stock of which is owned by Valhi, and the proposed merger of such non-operative corporation and Valhi by means of a mere majority vote, Contran has undertaken to manipulate[8] corporate machinery to accomplish an inequitable re-

---

7. See *Swanton v. State Guaranty Corporation*, Del.Ch., 215 A.2d 242 (1965), *Levin v. Midland-Ross Corporation*, Del.Ch., 194 A.2d 50 (1963), *Sporborg v. City Specialty Stores*, Del.Ch., 123 A.2d 1216 (1956), and *In Re General Realty and Utilities*, Del.Ch., 52 A.2d 6 (1947).

8. "The purpose of the formation of VIS as a wholly-owned subsidiary of Valhi and the transactions contemplated by the supplemental agreement is to (i) permit the merger agreement to be approved by a majority vote, rather than an 80% vote, of the outstanding shares of common stock and (ii) provide a mechanism for the issuance to Contran of all the shares of common stock to be outstanding following the merger." (proxy statement)

sult, namely the unilateral elimination of any interest in Valhi on the part of its minority stockholders in exchange for cash by a vote of less than 80% of such corporation's voting stock. Compare *Schnell v. Chris-Craft Industries, Inc.*, Del.Supr., 285 A.2d 437 (1971), and *Condec Corporation v. Lunkenheimer Company*, Del.Ch., 230 A.2d 769 (1971).

The question next presented is that of what relief should be granted plaintiffs. In a concurring opinion in the case of *Singer v. Magnavox*, supra, Justice McNeilly stated:

"To determine whether that burden [9] has been met under *Sterling*, I think the Court must scrutinize the business purpose, or economic necessity, desirability, and feasibility involved, evidence of self-serving, manipulation, or over-reaching, and all other relevant factors of intrinsic fairness or unfairness. Upon finding a breach of the fiduciary duty owed, the Court must then grant such relief as the circumstances require, by injunction, appraisal, damages, or other available equitable relief, if any, keeping in mind, however, the continuing legislative approval of mergers and the judicially mandated avoidance of their disruption by dissenting stockholders."

However, in the cited case the majority held:

"Defendants concede that they owe plaintiffs a fiduciary duty but contend that, in the context of the present transaction they have met that obligation by offering fair value for the Magnavox shares. And, say defendants, plaintiffs' exclusive remedy for dissatisfaction with the merger is to seek an appraisal under Section 262. We disagree. In our view, defendants cannot meet their fiduciary obligations to plaintiffs simply by relegating them to a statutory appraisal proceeding."

Furthermore, in *Tanzer v. International General Industries, Inc.*, supra, in which the finding by the Chancellor that a bona fide purpose for the merger existed and the consequent denial of a motion for a preliminary injunction were sustained by the Supreme Court of Delaware, the Court went on to decide:

"This ruling, however, does not terminate the litigation because given the fiduciary duty owed in any event by IGI to the minority stockholders of Kliklok, the latter are entitled to a fairness hearing under *Singer*. The Chancellor's opinion announced at the preliminary injunction stage of this proceeding, discussed fairness only in terms of the price offered for the stock, but that was too restrictive, the test required by *Singer*, which applied the rule of *Sterling*, involves judicial scrutiny for 'entire fairness as to all aspects of the transaction.'

\* \* \* \* \* \*

"The order of the Court of Chancery denying injunctive relief is affirmed and the case is remanded for further proceedings consistent herewith."

The merger here in issue, which has been found to be unfair to minority stockholders, remains unconsummated. In my opinion, it is for the majority stockholder and not for the Court to devise an alternate form of merger which may be either acceptable to all minority stockholders or found by the Court to be entirely fair to the minority. I accordingly conclude that the appropriate relief to be granted by this Court, insofar as the merger plan now before it is concerned, is the entry of an injunction against its consummation. A form of permanent injunction to such effect may be presented on notice.

9. "\* \* \* the burden to the majority to establish the entire fairness of the transaction."